UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OTIS BRUCE,

              Plaintiff,

      v.

COUNTY OF MARIN, et al.,

              Defendants.

Case No. 23-cv-03931-JST

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

Re: ECF No. 64

While Plaintiff Otis Bruce was the Assistant District Attorney ("ADA") of Marin County, many Deputy District Attorneys ("DDAs") submitted letters about him to Chief Deputy District Attorney ("CDDA") Dori Ahana. These letters alleged that Bruce had engaged in severe, chronic misconduct, manipulating and bullying other staff and creating an environment so hostile that many—especially women—felt compelled to depart. In response to the letters, which followed a "restorative justice" meeting convened to address employee concerns about workplace dynamics, District Attorney ("DA") Lori Frugoli asked Bruce to work remotely and subsequently placed him on paid administrative leave. She directed him not to contact the DDAs or CDDAs during that time. Bruce sued Frugoli and the County, alleging that the telework directive and administrative leave were retaliation for his support of a younger black DDA named Cameron Jones, and that Defendants had created a hostile work environment and constructively discharged him. While Bruce was still on paid administrative leave, and the investigation against him was pending, he retired from Marin County and began employment as ADA for Alameda County.

The County now moves for summary judgment on Bruce's claims. For the reasons set forth below, the Court will grant the motion.

## I.    BACKGROUND

### A.    Factual Background

The material facts are undisputed.  Plaintiff Otis Bruce was employed by the County of Marin in the District Attorney's Office from 1990 to 2022.  ECF No. 65-1 at 20–21.  He was promoted to ADA in August 2020 and held that role until he departed from the Office.  ECF No. 75 ¶ 22; ECF No. 65-1 at 21.  As ADA, he was not responsible for direct attorney supervision, which was handled instead by the two CDDAs, Rosemary Slote and Dori Ahana.  ECF No. 79-2 at 7; ECF No. 75 ¶ 27.  Bruce's duties as ADA included supervising clerical staff in the legal support division and victim witness division, running DEI and social justice programs, serving as the point person for questions or concerns about reports received from the California Department of Corrections, overseeing hate crime assignments, reviewing causes for extradition, recruiting, training, and community outreach, assisting the DA with overall administrative management of all office staff, and accompanying the DA to events.  ECF No. 79-2 at 7; ECF NO. 75 ¶ 22.  DA Frugoli was ultimately responsible for hiring and promotion decisions.  ECF No. 79-2 at 7–8; ECF No. 75 ¶ 27.

#### 1.    Marin County Personnel Management Regulations

Marin County's procedures governing its employees are entitled Personnel Management Regulations, or "PMRs."  The County's PMR 20 provides general employee standards of conduct and prohibits both discrimination and retaliation.  ECF No. 67-1 at 3–4.

PMR 21, "Equal Employment Opportunity and Anti-Harassment," includes PMR 21.4, "Complaint Resolution Process for Alleged Discrimination, Harassment or Retaliation."  ECF No. 67-1 at 8.  PMR 21.4 requires supervisors and managers to take "all steps necessary to . . . prevent" and "immediate action to stop" employment violations, discrimination, harassment, or retaliation, and to "tak[e] appropriate disciplinary action after timely investigation, where appropriate."  *Id*. at 10.

PMR 21.4 directs managers to report to the Equal Employment Officer or Director of Human Resources any discrimination, harassment and/or retaliation alleged by employees.  *Id*.  It further provides that "[c]omplaints meeting the criteria for harassment, retaliation or

discrimination . . . will be fully and impartially investigated and/or immediate appropriate corrective action will be taken." *Id.*

PMR 26, "Workplace Security, Safety and Violation in the Workplace," includes a form entitled "Workplace Security and Safety Incident Investigation Report" that an employee may fill out to report workplace security or safety concerns. ECF No. 69-20 at 5.

### 2. Bruce's Support for Cameron Jones

In 2021 and 2022, Mr. Bruce became concerned that a newly hired African American Deputy District Attorney, Cameron Jones, was being subjected to discriminatory treatment. ECF No. 75 ¶ 31. Bruce complained to Frugoli and the CDDAs that Jones was being singled out for performance issues common to other newly hired DDAs, and that he was not being given a fair opportunity compared to the newly hired white misdemeanor attorneys. *Id.* Jones began to complain to Bruce that his supervisors' and peers' behavior was harmful, disrespectful, unhelpful, and hostile, which Bruce passed on to DA Frugoli on multiple occasions. *Id.* ¶¶ 32–33. Between March and June 2022, CDDA Slote conducted a performance evaluation of Jones, the results of which Bruce complained were unfair and biased. *Id.* ¶ 36. After expressing to Bruce that she shared his concerns, Frugoli instructed Slote to rewrite the evaluation. *Id.* ¶ 37. Although Slote rewrote the evaluation, Frugoli nonetheless terminated Jones for poor performance on June 22, 2022. *Id.* ¶¶ 37, 39. At that point, Bruce told Frugoli that he believed her decision had violated the County's DEI Policy and Plan; "pointed out" that the DA's Office has a history of failing to hire, recruit, and retain ethnic minorities; and objected to having been excluded from the termination decision. *Id.*

Shortly after his termination, Jones filed an Equal Employment Opportunity Commission grievance against the DA, the two CDDAs, and other white attorneys, on which Bruce was listed as a witness. *Id.* ¶ 39. On July 29, 2022, DA Frugoli directed Bruce to participate in Jones's PMR 21 investigation. ECF No. 75 ¶ 39; ECF No. 75-19 at 2. Bruce's advocacy for Jones therefore began in 2021 and continued through the aftermath of his termination in late June 2022.

### 3. Restorative Justice Meeting and Complaint Letters

In 2019, prompted by a survey showing that only 54% of the DA's Office employees

considered themselves satisfied with their workplace, DA Frugoli engaged Lorenzo Jones and Rochelle Edwards to establish a trusted space for attorneys to share their opinions on leadership and to address morale issues. ECF No. 79-2 at 8. Lorenzo and Rochelle[1] were consultants from an organization called Transformative Leadership Institute, which focuses on professional leadership, organizational culture, and "restorative justice." *Id.*; ECF No. 75-14 at 2. In early 2022, the DA's Office again engaged Lorenzo and Rochelle for "a series of leadership/ organizational progress meetings" involving "leadership coaching and discussions." *Id.* at 2–3.

Later that year, the DA's Office asked the same consultants to conduct several internal "restorative justice" sessions aimed at addressing employee concerns about workplace dynamics. ECF No. 68 ¶ 4. The DA's Office management team, including Bruce and Frugoli, were excluded from these sessions. *Id.* A restorative justice meeting was held on Friday, July 22, 2022. *Id.* The following Tuesday and Wednesday, nine separate complaints regarding Bruce by Deputy District Attorneys ("DDAs") were submitted to CDDA Ahana. ECF No. 69-3 ¶¶ 4–14; ECF Nos. 69-4– 69-12; ECF No. 69-21. These letters were largely compiled and sent to Ahana by a DDA named ████████, who organized the effort by reaching out to DDAs who had described negative experiences with Bruce during the restorative justice meeting. ECF 79-4 at 7; ECF No. 76-8 at 8; ECF No. 73-8 at 3; ECF No. 9-4 at 8.

Painting a picture of chronic and severe misconduct by Bruce, these letters alleged that he made offensive remarks regarding DDAs' gender and identities, disparaged their ability or work ethic, made comments that appeared designed to manipulate or intimidate them, took credit for their successes, attempted to undermine the chain of command, and interfered with recruitment, hiring, and promotion. ECF No. 69-3 ¶¶ 4–14; ECF Nos. 69-4–69-12. A recurring theme of the letters was that Bruce sought to isolate and manipulate those he saw as loyal to him, while retaliating against and punishing those who were not. *Id.*

The complaint letters repeatedly and explicitly stated that Bruce had created a sexist work environment that was particularly hostile for women. For instance, one DDA alleged that Bruce

---

[1] The Court refers to these individuals by their first names to avoid confusing Lorenzo Jones with Cameron Jones. The Court intends no disrespect.

told him "[t]hat it was men specifically who were responsible for the great achievements of the world." ECF No. 69-5 at 3. Another DDA wrote that Bruce would "get upset" about female colleagues' attire and would repeatedly claim that a certain female DDA was only able to get a new job because "he taught her how to dress" by wearing skirts and pearl necklaces. ECF No. 69-9 at 6; *see also* ECF No. 69-11 at 2. When female DDAs left the office for other employment—and several did so during the relevant time period—Bruce routinely, falsely announced "that they were doing what's best for their families," even when the departing DDA took a lower-paying job further away from home to escape the environment of the DA's Office or went out of her way to explain that the departure was not family-motivated. ECF No. 69-8 at 4; ECF No. 69-9 at 7; ECF No. 69-11 at 4. After one DDA complimented Bruce's wife for caring for multiple children while he worked, Bruce corrected the DDA, emphasizing that *he* was the amazing one. ECF No. 69-11 at 4. He told a DDA that two of his female colleagues were "not ballers," ECF No. 69-5 at 3, and told another that the same two colleagues were not "bad asses," ECF No. 69-9 at 8. Bruce allegedly referred to one female DDA as "not ready for felonies, an idiot, inexperienced," said that she needed "to keep her mouth shut," and implied that she was racist. ECF No. 69-9 at 6. He said that another female DDA was "ungrateful, useless, undeserving of a permanent job, and unappreciative of all the things he has done for her." ECF No. 69-9 at 8.

One DDA stated that Bruce repeatedly told her how racist the DA's Office was, which she came to understand as intended to isolate her and make her feel dependent on Bruce's support. ECF No. 69-7 at 3–4. More specifically, Bruce repeatedly told the DDA that CDDAs Ahana and Slote harbored racial animus towards her, even though she later learned that was not true. *Id*. at 5. When that DDA later interacted with CDDA Ahana personally, she found it "eye-opening and relieving" to learn that she was "wanted and appreciated in the office" and she "felt terrible that [she] had let [Bruce] convince [her] differently." *Id*. On a similar vein, another DDA stated that Bruce had repeatedly told him that Ahana and Slote "hated [him]," that they were racist, and that Bruce was the only one fighting for him. ECF No. 69-9 at 4. The letters alleged that Bruce had a pattern of telling colleagues negative things about each other to "manipulate and divide" them. ECF No. 69-8 at 5. This included disparaging more senior DDAs to younger DDAs or even to

United States District Court
Northern District of California

interns.  ECF No. 66-10 at 51.

The letters paint a vengeful and retaliatory picture of Bruce.  Multiple DDAs reported that Bruce retaliated when they crossed him, for example, by delaying permission for one DDA to attend a training and excluding another from supervising interns.  ECF No. 69-7 at 7; ECF No. 69-10 at 5–6.  He called attorneys "lazy and ungrateful" if they worked from home.  ECF No. 69-9 at 8.  He also claimed credit for their past successes in order to coerce loyalty.  For instance, he told one DDA "I got you your last promotion.  Are you ready for me to get you another one?"  ECF No. 69-8 at 5.  To make them feel indebted to him, he told every new hire that they were "only here because of him."  ECF No. 69-8 at 2.

Many of the complaints directly alleged favoritism to Cameron Jones or unprofessional or toxic behaviors designed to protect him.  For instance, one DDA wrote that Bruce told her peers that she was a "poor leader" because she reported performance issues concerning Cameron Jones to management, as she had been directed to do.  ECF No. 69-4 at 4.  Another DDA wrote that, after a training concerning victims of sexual crimes, Bruce spoke at length to a group of attorneys about how they should cover up mistakes made by teammates and never report such mistakes to management.  ECF No. 69-7 at 6.  The DDA believed this to be in reference to Jones.  *Id*.  Bruce repeatedly threatened "to blow the whole place up" or "expose the entire office" if Jones was fired.  ECF No. 69-9 at 7.  Bruce was openly hostile towards DDAs who, as part of their assigned supervisory duties, raised concerns with Jones' work performance.  ECF No. 69-10 at 4.  One DDA wrote that "ANY complaints or negative comments regarding DDA Jones, even if warranted and necessary to flag in order for ethical and proper work to be done, would be met with push back and ultimately lead to the assumption that we were racist for raising complaints."  ECF No. 69-12 at 3.

The letters report an assortment of other misconduct as well.  One DDA reported that Bruce went behind her back to discuss resolution of one of her cases, a homicide, with the defense attorney.  ECF No. 69-7 at 6.  Another reported that Otis flew into a rage when he brought up the possibility of joining the prosecutors' union, and that he called one of the union heads "lazy, worthless, 'bitching about shit that doesn't matter,'" and indicated his intent to block him from

receiving a promotion.  ECF No. 69-9 at 5–6.  He subsequently repeatedly asked the DDA whether he had, in fact, joined the union.  *Id.* at 6.  Another DDA also wrote that Bruce told him not to report policy changes the DDA had made to the misdemeanor unit to Ahana and Slote, falsely told Ahana that he had not been aware of the changes, and then laughed about it behind her back.  ECF No. 69-9 at 4.

The letters expressed, in various terms, that they were motivated by the desire to "do the right thing."  ECF No. 69-5 at 2; ECF No. 69-9 at 3.  One wrote that "what I've heard from my co-workers cannot be ignored and I feel I must support them for the good of the office."  ECF No. 69-21 at 51.  Others explained that they spoke out because "[t]he office culture ha[d] become absolutely unbearable because of [Bruce]," ECF No. 69-21 at 43, or because they didn't "feel comfortable going into the office anymore and . . . [are] riddled with anxiety," ECF No. 69-9 at 10.  They explained that "several of us do not want to work in the office" because of "[Bruce's] sexism and the systemic issues above."  ECF No. 69-8 at 5.

On July 29, 2022, Ahana forwarded the letters to Equal Employment Opportunity Director Roger Crawford, believing that her duty to do so under PMR 21 had been triggered.  ECF No. 69-3 ¶ 16.  The same day, she received additional emails from four of the DDAs who had written complaint letters, which she understood as expressing concerns about the possibility of encountering Bruce going forward and the possibility that he would retaliate against them.  *Id.* ¶ 17.  Also on July 29, the DDAs' union representative, Susanna Farber, provided Crawford and Frugoli with two prior complaints regarding Bruce that had been submitted in October 2019 and February 2021.  The first alleged that Bruce had treated her in "one of the most condescending, patronizing, and disrespectful ways [she] ha[d] ever encountered."  ECF No. 69-29 at 3.  The second complaint accused him of poor leadership, bullying, favoritism, unfairness, and unprofessional communication.  ECF No. 69-30 at 3.

On August 2, 2022, three of the DDA complainants submitted PMR 26 Workplace Security and Safety Reports to express concerns over being retaliated against by Bruce.  ECF No. 69-20 ¶¶ 10–13.

After reviewing the complaints detailed above, Crawford determined that they contained

information consistent with a violation of PMR 21.  ECF No. 69-20 ¶ 14.  The County therefore retained an independent investigator to examine the allegations against Bruce and render findings of fact.  *Id.* ¶ 15.

### 4.        Mandated Remote Work

On August 2, 2022, in response to these complaints, Frugoli called Bruce to a meeting to direct him to work remotely.  ECF No. 75 ¶ 43; ECF No. 79-2 at 11; ECF No. 69-28 ¶ 7.  In the meeting, she handed him a letter informing him that the County was initiating an investigation into whether Bruce's conduct violated PMRs 20, 21, and 26.  ECF No. 68-3.  In addition to the telework directive, she relieved him of any duties requiring engagement with other attorneys in the office, directed him not to contact the DDAs and CDDAs, and prohibited him from reporting back to the office absent her prior agreement.  *Id.* at 2.  Bruce testified that he was told to continue performing most of his job duties remotely and that misdemeanor attorneys were "never a big part of [the] focus of [his] day."  ECF No. 65-2 at 9; ECF No. 65-1 at 17.

Between August 9 and September 8, 2022, Bruce repeatedly complained to Frugoli that he was unable to work remotely due to IT issues, including poor internet connectivity and the lack of ergonomic equipment.  ECF No. 68-4.  Frugoli promptly directed Bruce to contact specific personnel to request equipment to address both concerns, but Bruce never did so.  ECF No. 75-21 at 2; ECF No. 65-1 at 15–16.  With respect to internet connectivity, Bruce asserts without further evidence that IT support would not have alleviated the difficulty.  ECF No. 75 ¶ 45.

On September 2, 2022, Frugoli sent an email directing Bruce again not to contact attorney members of the office and to contact IT for remote work assistance.  ECF No. 75 ¶ 44.  On September 5, 2022, a DDA requested a leave of absence in part related to plaintiff's reported presence near the DA's Office during the week prior.  ECF No. 66-15 at 2–3.

### 5.        Paid Administrative Leave and Aftermath

Because Bruce repeatedly claimed that he was unable to work remotely effectively, and after the DDA's request for a leave of absence, Ms. Frugoli determined that Bruce should be placed on paid administrative leave pending the investigation.  ECF No. 68 ¶ 10; ECF No. 68-6.  She did so on September 13, 2022.  *Id.*; ECF No. 79-2 at 12.

United States District Court
Northern District of California

1    On December 21, 2022, prior to the completion of the investigation of his alleged

2    misconduct, Bruce resigned from the DA's Office effective December 31, 2022.  On January 3,

3    2023, he was hired as an ADA for the County of Alameda, which paid a substantially higher

4    salary.  ECF No. 65-3 at 21.

5    In February 2023, the independent investigation concluded and found that plaintiff (1)

6    made offensive comments based on other DDAs' identities and status; (2) made disparaging

7    comments about five DDAs, two Chief Deputy District Attorneys, and Ms. Frugoli to other

8    attorneys in the office; (3) attempted to learn what was discussed in the June and July 2022

9    restorative justice meetings by calling DDAs who attended and lingering around attorneys' offices

10   in an intimidating manner; and (4) used his position of power to manipulate, isolate, and

11   intimidate DDAs.  ECF No. 67-8.  Equal Employment Opportunity Director Crawford reviewed

12   the investigation report, concurred with the findings, and determined that plaintiff violated the

13   County's PMRs 20 and 21.  ECF No. 67 ¶¶ 15, 16.

14   **B.      Procedural Background**

15   Bruce filed this lawsuit on August 4, 2023, bringing claims against Frugoli and the County

16   under 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"),

17   the California Fair Employment and Housing Act ("FEHA"), and California Labor Code Section

18   1102.5.  ECF No. 1.  He filed an amended complaint on October 31, 2023.  ECF No. 11.  He

19   alleges that Defendants retaliated against him in violation of Title VII, FEHA, and California

20   Labor Code Section 1102.5 because he spoke out against mistreatment of Cameron Jones.  *Id*.

21   ¶¶ 30–49.  He also alleges that he was subjected to a hostile work environment and constructively

22   discharged.  *Id*. ¶¶ 50–57.  Finally, he alleges that Defendants failed to prevent retaliation against

23   him in violation of Title VII and FEHA.  *Id*. ¶¶ 58–60.  Each count is against both Frugoli and the

24   County, except for his FEHA-based retaliation and failure to prevent claims, which are against the

25   County only.  ECF No. 11.

26   Defendants filed a motion for summary judgment on September 18, 2025.  ECF No. 64.

27   Bruce opposed on October 30, 2025, ECF No. 80, and Defendants replied on November 26, 2025,

28   ECF No. 87.

United States District Court
Northern District of California

1    II.     JURISDICTION

2         The Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

3    III.    LEGAL STANDARD

4         Summary judgment is only appropriate when the movant shows "there is no genuine

5    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6    Civ. P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court

7    "must draw all reasonable inferences supported by the evidence in favor of the non-moving party."

8    *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *see also Matsushita*, 475

9    U.S. at 587. The inquiry is "whether the evidence presents a sufficient disagreement to require

10   submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

11   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986).

12   IV.     DISCUSSION

13       A.     Retaliation Under Title VII and FEHA

14       Bruce's first and second causes of action allege retaliation in violation of Title VII and

15   FEHA, respectively. ECF No. 11 ¶¶ 30–42. Additionally, Bruce alleges that Defendants failed to

16   prevent discrimination and retaliation in violation of Title VII and FEHA. *Id.* ¶¶ 58–60. These

17   claims are based on Bruce's theory that Defendants directed him to work remotely and

18   subsequently placed him on paid administrative leave in retaliation for the complaints he made

19   concerning the treatment of Cameron Jones.

20       Title VII prohibits an employer from discriminating against an individual because "he has

21   opposed any practice made an unlawful employment practice by this subchapter, or because he has

22   made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

23   hearing under this subchapter." 42 U.S.C. § 2000e-3(a). FEHA prohibits an employer from

24   "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because the person

25   has opposed any practices forbidden under this part or because the person has filed a complaint,

26   testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h).

27       Retaliation claims under FEHA and Title VII follow the *McDonnell Douglas* burden-

28   shifting framework: (1) the plaintiff first must establish a prima facie case of retaliation, (2) the

United States District Court
Northern District of California

10

employer must articulate a legitimate, non-retaliatory reason for the alleged adverse employment action, and then (3) the plaintiff must show that the employer's articulated reason was pretext for retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (applying the burden-shifting framework to a Title VII discrimination claim); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005) (applied to FEHA retaliation claims); *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (applied to Title VII retaliation claims).

To establish a prima facie case for retaliation under Title VII and FEHA, the plaintiff must show: (1) that he engaged in a "protected activity"; (2) that the defendants subjected him to an adverse employment action; and (3) that a causal link existed between the two. *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 472 (2004) (FEHA); *Villiarimo*, 281 F.3d at 1064 (Title VII).

In their motion for summary judgment, Defendants argue that (1) the mandatory telework and paid administrative leave were not "adverse employment actions," and (2) that Bruce has raised no genuine issue of fact that the County's nonretaliatory reason for taking those actions— the extensive employee complaints against him—was pretextual.  The Court first concludes that the paid administrative leave was an adverse employment action because it included a requirement that Bruce not contact other DA's Office attorneys.  Turning to pretext, however, the Court concludes that Bruce has identified no evidence sufficient to raise a genuine issue of fact that the County's stated reason was pretextual.  Because Defendants have met their burden to establish a nonretaliatory reason for the adverse employment actions and Bruce cannot show that reason to be pretextual, the Court grants summary judgment to Defendants on Bruce's Title VII and FEHA retaliation claims.

### 1.    Adverse Employment Action

Prior to his resignation, Bruce was asked to work remotely and subsequently placed on paid administrative leave.  Defendants argue that under the circumstances, neither the mandated remote work nor the administrative leave constituted an adverse employment action under Title VII or FEHA's retaliation provisions.  ECF No. 64 at 18–20.  While the determination is fact-dependent, courts are especially likely to find that paid administrative leave is an adverse employment action when it is accompanied by an order that the plaintiff refrain from contacting

United States District Court
Northern District of California

his coworkers.  On the facts before the Court, the Court concludes that Bruce was subjected to an adverse employment action.

The FEHA definition of an adverse employment action is set forth in California Government Code Section 12940(a), which prohibits discrimination "in terms, conditions or privileges of employment." *Yanowitz*, 36 Cal. 4th at 1049.  Courts identify cognizable adverse employment actions using the "materiality" test, which asks whether, considering the totality of circumstances, the employer's adverse action materially affects the terms and conditions of employment.  *Yanowitz*, 36 Cal. 4th at 1036, 1051–52 (citing *Akers v. County of San Diego*, 95 Cal. App. 4th 1441, 1454–57 (2002)).  "The plaintiff must show the employer's retaliatory actions had a detrimental and substantial effect on the plaintiff's employment." *McRae v. Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 386 (2006).  "[T]he phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." *Flores v. City of Westminster*, 873 F.3d 739, 748–49 (9th Cir. 2017) (citing *Yanowitz*, 36 Cal. 4th at 1054).  FEHA therefore recognizes "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." *Yanowitz*, 36 Cal. 4th at 1054.

Under Title VII, by contrast, a plaintiff must show that the challenged action "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  An adverse employment action for Title VII retaliation purposes need not be a "change in the terms and conditions of employment." *Id.* at 70.  In reaching this conclusion, the Supreme Court contrasted the Title VII antiretaliation provision with its antidiscrimination provision.  While the antidiscrimination provision applies only to discrimination "with respect to his compensation, terms, conditions, or privileges of employment" and prohibits "depriv[ing] any individual of employment opportunities or otherwise adversely affect[ing] his status as an employee," the Title VII antiretaliation provision contains no such

limiting language, referring broadly to "discrimination" against the employee. *Id*. at 60, 61–62. The Court also observed that because retaliation need not be related to employment to effectively interfere with an employee's right to complain, Title VII's purpose supported its holding. *Id*. at 63. As under FEHA, identifying an adverse employment action requires considering the particular circumstances, including the "expectations[] and relationships" of the workplace. *Id*. at 69.

It is worth noting at this stage that although California courts generally draw on Title VII jurisprudence in interpreting FEHA, they have not yet applied *Burlington Northern* to FEHA, so *Yanowitz* still governs. *Bailey v. San Francisco Dist. Attorney's Off.*, 16 Cal. 5th 611, 637 n.8 (2024). As a result, while FEHA and Title VII discrimination claims and FEHA retaliation claims require the adverse action to be related to the terms and conditions of employment, Title VII retaliation claims do not.

Under both standards, a change that is merely "contrary to the employee's interests," "not to the employee's liking," "inconvenient and irritating," or "personally humiliating" is insufficient. *Akers*, 95 Cal. App. 4th at 1455; *McRae*, 142 Cal. App. 4th at 393; *see Burlington Northern*, 548 U.S. at 68 (holding that "normally petty slights, minor annoyances, and simple lack of good manners will not create [the requisite] deterrence").

Bruce argues that the work-from-home order significantly affected the terms and conditions of his employment because he "did not want to work from home," had never done so during his 32-year career, and found his remote environment to be "demeaning and embarrassing." ECF No. 80 at 14. But actions by the employer that the plaintiff simply does not prefer, even because they are "embarrassing," do not alone rise to the level of adverse employment actions. *McRae*, 142 Cal. App. 4th at 393 (rejecting plaintiff's retaliation claim in part based on a job transfer which resulted in worse working conditions including the absence of a lab coat, desk, or workplace, because "matters such as the lack of a lab coat or a desk do not compare in significance to matters such as demotions, loss of pay or benefits, public humiliation, or harassment in the workplace"); *cf. Matthews v. City of Tempe*, No. CV-22-00407-PHX-SPL, 2023 WL 6880652, at *3, 8 (D. Ariz. Oct. 18, 2023), *aff'd*, No. 23-2976, 2025 WL 1778830 (9th Cir. June 27, 2025) ("Plaintiff's denied request to telework does not constitute an adverse employment

13

decision" under Title VII because the period of telework would have been temporary and the employee's duties and pay would not have changed); *Dennis v. Nevada*, 282 F. Supp. 2d 1177, 1186 (D. Nev. 2003) ("[M]ere ostracism does not constitute an adverse employment action." (citing *Strother v. Southern California Permanente Medical Group,* 79 F.3d 859, 869 (9th Cir. 1996)).

Bruce also argues that he was unable to work as effectively while teleworking because his job responsibilities included supervising staff members who mainly worked at the DA's Office and he lacked the infrastructure needed for remote work. ECF No. 79-2 at 15. Changes in working conditions may constitute adverse employment actions under Title VII or FEHA if they disrupt the employee's ability to effectively perform his work. *See Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1125–26 (9th Cir. 2000) (finding that a forcible lab relocation was an adverse employment action for employment discrimination purposes because it resulted in disruption to experiments, causing research grants to be lost or withheld, impacting plaintiffs' salary); *Patten v. Grant Joint Union High School Dist.*, 134 Cal. App. 4th 1378, 1390 (2005), *disapproved on other grounds by Lawson*, 12 Cal. 5th 703 (finding that actions "reasonably likely to impair" the plaintiff's job performance, including inadequate administrative and budgetary support and scheduling issues, could constitute an adverse employment action).

The most significant problem with Bruce's argument is that he never requested the support and equipment from IT that would have alleviated his logistical issues, even though Frugoli directed him to do so. ECF No. 64 at 15; ECF No. 87 at 20. Bruce does not deny that he failed to make these requests—in fact, he makes no response on this point at all. ECF No. 79-2 at 14–15. It therefore appears that Bruce's lack of access to infrastructure was attributable to his own inattention rather than the remote work directive itself. Moreover, Bruce has put forth no evidence that the performance of his duties was impaired by telework, stating only that he found it "difficult" to supervise other staff because he "had never telecommuted" before. ECF No. 79-2 at 15. The County, meanwhile, points to uncontested evidence that Bruce continued to carry a caseload, was directed to perform most of his normal duties, and was able to complete all required tasks while teleworking. ECF No. 64 at 19 (citing ECF No. 65-2 at 9); ECF No. 73-6 at 7–10

14

1  (Frugoli testimony, solicited by Bruce's counsel, that Bruce completed all of his required tasks

2  successfully); ECF No. 79-2 at 15 (Bruce's brief arguing that "Bruce was able to complete all

3  required tasks").  As the Court has explained, irritations and inconveniences concerning the

4  conditions of work are not alone actionable, even under the more expansive Title VII definition.

5  Under these circumstances, the order requiring Bruce to work remotely was not an adverse

6  employment action.

7      Bruce's placement on administrative leave, however, did constitute an adverse

8  employment action.  Under both FEHA and Title VII, courts are more likely to conclude that

9  nondisciplinary, investigative paid administrative leave—like Bruce experienced here—rises to

10  the level of an adverse employment action when it is accompanied by a deprivation of

11  employment privileges.  Here, because the paid leave was combined with a directive to avoid

12  contacting the DDAs and CDDAs, it is an adverse employment action under Title VII and FEHA.

13      Several decisions from California and Ninth Circuit courts inform this Court's analysis.  In

14  *Rattie v. Balfour Beatty Infrastructure, Inc.*, a court in this district held that, for purposes of FEHA

15  retaliation, "[a] reasonable juror could find [the plaintiff] suffered an adverse employment action

16  when Balfour placed him on paid administrative leave" for alleged violations of the employer's

17  confidentiality policy, particularly because that leave was accompanied by the termination of

18  network access."  No. 22-CV-05061-RS, 2023 WL 8115047, at *5 (N.D. Cal. Nov. 22, 2023).  In

19  *Rattie*, as here, the paid leave was not necessarily punitive or disciplinary, but served the

20  employer's ability to investigate and prevent alleged misconduct.  *Id*. at *2.

21      In *Gannon v. Potter*, the court held that "being placed on paid administrative leave is *not*

22  an adverse employment action, because it does not deprive a plaintiff of any term, condition, or

23  benefit of employment."  No. C 05-2299SBA, 2006 WL 3422215, at *1 (N.D. Cal. Nov. 28,

24  2006), *aff'd*, 298 F. App'x 623 (9th Cir. 2008) (emphasis added); *see also Tomczak v. Safeway,*

25  *Inc.*, 1997 WL 564049, at *5 (N.D. Cal. 1997).[2]  Importantly, however, *Gannon* emphasized the

26

27  _____

28  [2] *Gannon* was a Title VII discrimination case, so its adverse employment action analysis applies to
FEHA retaliation, but not Title VII retaliation, as the Court noted above.  2006 WL 3422215, at
*3.

absence of any deprivation accompanying the administrative leave, unlike in *Rattie*, where the plaintiff lost network access.  Here, Bruce was deprived of the ability to communicate with his coworkers, which distinguishes this case from *Gannon*.

The Ninth Circuit first addressed whether paid administrative leave might rise to the level of an adverse employment action in *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013).  *Dahlia* held that paid administrative leave constituted an adverse employment action sufficient to dissuade the employee in that case from protected activities because it prevented the plaintiff from taking an exam necessary to receive a promotion, required him to forfeit on-call and holiday pay, prevented him from furthering his investigative experience, and subjected him to general stigma.  *Id*. at 1079.  *Dahlia* addressed the context of First Amendment retaliation, which uses the same standard as Title VII retaliation.  *Maya v. Leprino Foods Co.*, 2014 WL 1091251 (E.D. Cal. Mar. 18, 2024).

*Franks v. City of Santa Ana*, a Title VII discrimination case, is most on point.  After an anonymous letter prompted the police department to investigate allegations that Franks, a police commander, had created a hostile workplace, she was placed on administrative leave, publicly escorted her to her office to gather her personal belongings, relieved of her computer hard drive, and escorted from the building.  No. SACV15108JVSDFMX, 2015 WL 13919157, at *2 (C.D. Cal. Apr. 27, 2015).  Franks was ordered to remain away from the SAPD building and to refrain from contact with multiple individuals identified as witnesses for the investigation.  *Id*.  She also alleged that, although she was ultimately cleared by the investigation, the witnesses for the investigation—her subordinates—were not informed of that fact until months after the investigation had concluded, which she alleged compromised her ability to lead her team.  *Id*.  In concluding that these circumstances rose to the level of an adverse employment action, the Court emphasized that Franks was required to surrender her city vehicle and duty weapon and avoid contact with potential witnesses in the investigation, among whom she counted "some of her 'closest friends and support system.'"  *Id*. at *4.

Like Franks, Bruce was forbidden from contacting his coworkers.  Unlike in *Franks*, that prohibition extended to all of the DDAs and CDDAs in the Office—not just witnesses in the

ongoing investigation.  Moreover, while *Franks* addressed the adverse employment standard for purposes of Title VII discrimination (which matches that for FEHA retaliation), Bruce's Title VII claims are for retaliation and enjoy the broader definition of adverse employment action provided by the Supreme Court in *Burlington Northern*.  Following the lead of the district courts in *Franks* and *Rattie*, the Court concludes that under the circumstances, the paid administrative leave here rose to the level of an adverse employment action under both FEHA and Title VII.

### 2.    Pretext

The County next argues that it has established a nonretaliatory explanation for its actions and Bruce has failed to raise a material issue of disputed fact that the nonretaliatory explanation— the substantial body of employee complaints it received—was pretextual.  ECF No. 64 at 20–22.  Apparently conceding that Defendants have met their burden to establish a nonretaliatory reason, Bruce argues only that their reason is pretextual rather than legitimate.  ECF No. 79-2 at 18–19.

Both Title VII and FEHA utilize the *McDonnell Douglas* burden-shifting framework, and courts describe the plaintiff's burden at the third step in parallel terms under both statutes.  Under Title VII, the plaintiff may offer "circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).  When a plaintiff relies on circumstantial evidence to show pretext, however, "that evidence must be specific and substantial to defeat the employer's motion for summary judgment."  *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting *Coghlan v. Am. Seafoods Co. LLC,* 413 F.3d 1090, 1095 (9th Cir.2005).

Under FEHA, the plaintiff must "offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination."  *Reeves v. MV Transportation, Inc.*, 186 Cal. App. 4th 666, 673 (Ct. App. 2010) (quotation omitted).  The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

17

1    factfinder could rationally find them unworthy of credence, and hence infer that the employer did

2    not act for the asserted nondiscriminatory reasons." *McRae*, 142 Cal. App. 4th at 388–89 (citation

3    modified).

4         "An employer's reasons need not rest upon true information." *Means v. City and County

5    of San Francisco*, 749 F. Supp. 2d 998, 1004 (N.D. Cal. 2010). "Rather, courts 'only require that

6    an employer honestly believed its reasons for its actions, even if its reason is foolish or trivial or

7    even baseless.'" *Villiarimo*, 281 F.3d at 1063 (quoting *Johnson v. Nordstrom, Inc.*, 260 F.3d 727,

8    733 (7th Cir. 2001)). This is because "the factual dispute at issue is whether discriminatory

9    animus motivated the employer, not whether the employer is wise, shrewd, prudent, or

10   competent." *Reeves*, 186 Cal. App. 4th at 673–74 (quotation omitted).

11        The County's nonretaliatory explanation for the actions it took against Bruce is very

12   strong. Having received complaints about Bruce's conduct from eleven different current or former

13   employees, the County had a duty to take preventative action. ECF No. 69-3 ¶¶ 4–14; ECF Nos.

14   69-4–69-12. As the Court described above, the complaints allege that Bruce created a pervasive

15   toxic environment by making offensive remarks regarding colleagues' gender and identities,

16   disparaging colleagues' professional abilities or efforts, manipulating, intimidating, and punishing

17   DDAs for perceived disloyalty, undermining the chain of command, and interfering with

18   recruitment, hiring, and promotion. *Id*. Defendants' duty to act in response to these complaints is

19   clearly established by the County's own Personnel Management Regulations, EEOC Guidance,

20   and California statute. *See* Marin County PMR 21.4 (requiring supervisors and managers to take

21   "all steps necessary to . . . prevent" and "immediate action to stop" employment violations,

22   discrimination, harassment, or retaliation); Equal Employment Opportunity Commission,

23   Enforcement Guidance on Harassment in the Workplace, Notice No. 915.064 (Apr. 29, 2024) ("In

24   some cases, it may be necessary, given the seriousness of the alleged harassment, for the employer

25   to take intermediate steps to address the situation while it investigates the complaint."); Cal. Gov't

26   Code § 12940(k) (making it unlawful for an employer "to fail to take all reasonable steps

27   necessary to prevent discrimination and harassment from occurring"); *see also Holly D. v.

28   California Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2003) (an employer is liable for

United States District Court
Northern District of California

18

harassment by a supervisor under Title VII unless an affirmative defense—such as the employer's exercise of reasonable care to prevent and correct the harassment—applies).

Bruce raises four categories of argument that Defendants' nonretaliatory reason was pretextual. First, he avers that the complaints arose from a coordinated "smear campaign." [3] ECF No. 79-2 at 19–20. Second, he purports to identify contradictions within the contents of the complaints. *Id*. at 20–27. Third, he argues that the reasons Frugoli provided for moving him from telework to administrative leave are inconsistent or illogical. *Id*. at 27–29. Finally, Bruce briefly argues that he was treated unfairly relative to CDDA Slote, a white female against whom a complaint had previously been lodged. *Id*. at 29. The Court addresses each argument in turn.

First, no reasonable jury could conclude there was a smear campaign. The complaints against Bruce were submitted after the District Attorney's office conducted a meeting to address workplace culture issues, facilitated by outside consultants with whom the County had a relationship predating Bruce's tenure as ADA. Bruce does not argue that Frugoli convened the meeting to address complaints about Bruce in particular. *Cf. Yanowitz*, 36 Cal. 4th at 1062 (noting that the employer's "active solicitation of negative information concerning [plaintiff] . . . strongly suggest the possibility that her employer was engaged in a search for a pretextual basis for discipline."). Although the letters were organized to some extent by an individual DDA, ███ ████, Bruce identifies no evidence suggesting that ██████ motivations were tainted.

Moreover, even if there were evidence of a smear campaign, it would only establish pretext Defendants orchestrated it or knowingly took advantage of it to enact retaliation. In other words, if a smear campaign existed but was orchestrated by others and unknown to Frugoli, then that would not establish that her stated reasoning was insincere or pretextual. Rather, it would

---

[3] Merriam-Webster's Collegiate Dictionary, which the Court customarily consults, *see* The Redbook: A Manual on Legal Style 136 (4th ed.2013), does not define "smear campaign," but it defines smear to mean "to vilify especially by secretly and maliciously spreading grave charges and imputations," Merriam-Webster's Collegiate Dictionary 1177 (11th ed. 2020). Wikipedia defines "smear campaign" as "an intentional, premeditated effort to undermine an individual's or group's reputation, credibility, and character. "Smear campaign," Wikipedia, https://en.wikipedia.org/wiki/Smear_campaign (last visited January 29, 2026). The New Shorter Oxford English Dictionary defines "smear campaign" to mean "a plan to discredit a public figure by means of slanderous stories." 2 New Shorter Oxford English Dictionary 2910 (1993).

United States District Court
Northern District of California

1    establish that she had been misled.  *See Villiarimo*, 281 F.3d at 1063 ("[C]ourts 'only require that

2    an employer honestly believed its reasons for its actions.'").  There is no evidence that Frugoli was

3    aware of or participated in a smear campaign or that ████ was acting on her behalf.

4        Bruce also argues that the letters contained inconsistencies.  But again, Frugoli is the one

5    who took action against Bruce and Bruce must show that *her* reasons for taking those actions were

6    pretextual.  Inconsistencies in the employee narratives are relevant only if Bruce can show that (1)

7    Frugoli should have noticed those inconsistencies and (2) that they were so severe that she should

8    have disregarded the remaining content of the complaints and concluded that she was under no

9    duty to take preventative or corrective action.  Most of the "inconsistencies" identified by Bruce

10   are so trivial as to be irrelevant.  And even if each of Bruce's purported inconsistencies were

11   genuinely inconsistent, the remaining employee allegations were so voluminous and so severe that

12   Frugoli was still warranted in taking remedial action.

13       In addition to being trivial—and therefore irrelevant—many of the "inconsistencies" Bruce

14   identifies are nonsensical.  For instance, he suggests that if he advanced a female DDA's career,

15   then he could not have been sexist.  *See* ECF No. 79-2 at 21 ("[The DDA]'s letter . . . shows how

16   Mr. Bruce supported her career, which contradicts allegations that he engaged in sexist

17   behavior.").  Another DDA stated that he wrote a complaint letter, even though doing so was

18   against his interests, because he had benefited from his friendship with Bruce.  ECF No. 79-2 at

19   21.  Bruce argues that this is "evidence of the clearly manufactured nature of this orchestrated

20   smear campaign," but the Court is unable to make that connection.  *Id*.  Bruce suggests that

21   because he "allowed" certain white DDAs to be promoted, this means he did not also favor other

22   DDAs for promotions because they were nonwhite.  *Id*. at 25.  He asserts that because he did not

23   say anything negative about a certain DDA during her application process, it cannot be true that he

24   demonstrated a misogynistic attitude towards her once she arrived in the office, as she alleged.  *Id*.

25   at 26.  Most of the remainder of Bruce's alleged inconsistencies suffer from similar problems.

26       The closest Bruce comes to an actual inconsistency is the fact that the letters blamed Bruce

27   for allegedly sexist or unfair hiring and promotion decisions, even though Frugoli was ultimately

28   in charge of hiring decisions.  ECF No. 79-2 at 20, 23.  This falls well short, however, of

United States District Court
Northern District of California

establishing pretext.  First, as the Court detailed above, the letters contain voluminous accusations of harmful misconduct that was untethered to hiring and promotions.  And second, the fact that Frugoli made ultimate personnel decisions does not rule out the possibility that Bruce, as the ADA, sought to or did influence those decisions in a problematic manner.  In fact, as Bruce stated in his declaration, he "normally" discussed "decisions about attorney training, hiring, and promotions" with Frugoli.  ECF No. 75 at 13.  Bruce notes that some of the complaints included concerns not attributable to his conduct, such as an unsustainable workload, ECF No. 79-2 at 23, but that does nothing to undercut or qualify the comments about Bruce.  While the Court cannot address every "inconsistency" in this order, it notes that Bruce identifies none casting doubt on the appropriateness of the actions that Defendants took against him.

Third, Bruce argues that Frugoli's reasons for placing him on paid administrative leave— as opposed to allowing him to continue teleworking—were "weak, implausible, inconsistent, incoherent, or contradictory."  ECF No. 79-2 at 27.  The argument lacks merit.  Bruce has not identified any evidence creating a genuine issue on this point.  Frugoli first placed Bruce on mandatory telework to protect many of her DDAs from the abusive behavior of which they complained and to investigate the truth of those allegations.  This proved to be an unworkable solution for two reasons: because Bruce complained that he could not telework effectively, and because Bruce showed up near the DA's Office, causing one of the employees Frugoli was obligated to protect to take a week off for mental health reasons.  ECF No. 68 ¶ 10; ECF No. 68-5.  Bruce argues that this explanation is pretextual because "Frugoli admitted that as of September 13, 2022, she had no evidence that Mr. Bruce violated her August 2, 2022, directive not to contact DDAs or CDDAs."  ECF No. 79-2 at 28.  But Defendants' explanation is not that Bruce violated the directive, but that he made DDAs uncomfortable via his proximity to work.  And while Bruce argues that being placed on leave did not *bar* him from being near work, it removed any significant reason for him to be present there.  ECF No. 79-2 at 28.  Finally, Bruce argues Frugoli's explanation that he could not work effectively was incorrect because he finished all of his work, ECF No. 79-2 at 28–29, but paid leave was a valid means for redressing Bruce's repeated complaints that his working situation was "precarious," "inequitable," and that he was

1    "unable to effectively do work."  ECF No. 75-21 at 2–3; ECF No. 68-4 at 3.

2        Fourth, Bruce argues that he was treated differently than CDDA Slote had been when a

3    complaint was lodged against her.  He states that a Supervisor for the Victim Witness Advocate

4    Unit named Nilda Fernandez complained that Slote verbally berated, embarrassed, and humiliated

5    her one-on-one and in meetings, to the point that Fernandez took medical and stress leave and felt

6    forced to retire.  ECF No. 75 ¶ 28.  DA Frugoli addressed Fernandez's complaints by

7    reprimanding Slote and removing her from general management and grant program director

8    duties, but not by banning her from the office or instructing her not to speak with Fernandez.  *Id*.

9        The comparison to Slote does not aid Bruce's case.  Slote was accused of bullying a single

10   employee in connection with that employee's work.  By comparison, eleven employees accused

11   Bruce of manipulation, retaliation, sexism, and other misconduct conduct spanning a period of

12   years.  Moreover, according to Bruce's account, Slote was immediately reprimanded and removed

13   from any problematic duties.  Bruce was not reprimanded, but like Slote, he was placed in a

14   position designed to avoid further misconduct of the type alleged against him.  Bruce was

15   prohibited from contacting the DDAs because the complaints against him were systemic, whereas

16   Slote was removed from supervising the sole employee she allegedly harmed.

17       The *only* evidence that Bruce has put forward supporting his view that the County's

18   actions were in retaliation for his support of Cameron Jones is that (1) Frugoli was aware of

19   Bruce's protected activity and (2) the County's actions against Bruce in August and September of

20   2022 followed his protected activity, which spanned from 2021 to 2022.  ECF No. 79-2 at 18;

21   ECF No. 75 ¶¶ 31–32.  These facts alone cannot establish that Defendants' stated explanation for

22   their actions was pretextual.  *See Kama v. Mayorkas*, 107 F.4th 1054, 1061 (9th Cir. 2024)

23   (holding that temporal proximity, when "not particularly strong," is insufficient to show pretext).[4]

24   _____

25   [4] "In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of
     retaliation for purposes of both the prima facie case and the showing of pretext."  *Dawson v. Entek*

26   *Int'l*, 630 F.3d 928, 937 (9th Cir. 2011).  In *Dawson*, for instance, the plaintiff had been
     experiencing derogatory comments concerning his sexual orientation at work.  *Id*. at 933.  Under

27   stress because of the negative work environment, he took a day off work without complying with
     the required absence procedure.  *Id*.  The next day, he complained to human resources about the

28   derogatory comments.  *Id*.  Two days later, he was terminated, ostensibly for failing to comply

Frugoli received a large body of serious complaints made by a significant percentage of the employees in the office. She took reasonable measures to address the alleged misconduct, first by allowing Bruce to continue working outside the presence of the employees he had allegedly harmed, and then by placing him on paid administrative leave when it became clear that the telework directive was unworkable for Bruce and insufficient to protect her staff. Bruce identifies no evidence that Frugoli had a retaliatory motive. He identifies no evidence of a smear campaign except that the complaints arose all at once—but only because they were prompted by a meeting to address workplace culture issues. He fails to identify any inconsistencies sufficient to cast doubt on Frugoli's motives in responding to a deluge of allegations by her DDAs. In the absence of any evidence of pretext, the Court grants Defendants' motion for summary judgment as to Bruce's FEHA and Title VII claims for retaliation and failure to prevent retaliation.

### B.    Retaliation for Whistleblower Disclosure Under Labor Code § 1102.5

Bruce's third cause of action, based on the same underlying theory, alleges that Defendants retaliated against him for protected whistleblower activities, in violation of California Labor Code § 1102.5. ECF No. 11 ¶¶ 43–49. California Labor Code Section 1102.5 prohibits an employer from retaliating against an employee for certain protected activities, including disclosing information that the employee reasonably believes concerns a violation of local, state, or federal statute or regulation "to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance."

Retaliation claims under Section 1102.5 employ a two-part burden-shifting framework distinct from the *McDonnell Douglas* test. First, the plaintiff must demonstrate by a preponderance of the evidence that his protected whistleblowing was a 'contributing factor' to an adverse employment action. *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 712

---

with the absence procedure. *Id*. at 933–34. The court held that *Dawson* had defeated summary judgment on pretext because 1) the adverse action occurred "at most two days" after the protected activity and 2) Dawson had explained to his employer that the nonretaliatory reason—his absence—had been caused by the mistreatment of which he complained to HR. *Id*. at 937. Neither of the two points raised by the Court supports Bruce's position here, because the temporal connection is more attenuated and the nonretaliatory reason is not linked to the protected activity in the same way.

United States District Court
Northern District of California

(2022) (quoting Cal. Lab. Code § 1102.5).  "Then, once the employee has made that necessary threshold showing," the employer must "'demonstrate by clear and convincing evidence' that the alleged adverse employment action would have occurred 'for legitimate, independent reasons' even if the employee had not engaged in protected whistleblowing activities."  *Id*. (quoting Cal. Lab. Code § 1102.5).  If the employer shows by clear and convincing evidence it would have taken same action regardless of protected activity, the employee is not entitled to relief even if retaliation was a contributing factor.  *Ververka v. Department of Veterans Affairs*, 102 Cal. App. 5th 162, 172–175 (2024).

Bruce has abandoned his whistleblower claim because he does not address the distinct legal framework of Section 1102.5 or argue that its elements have been met.  ECF No. 79-2; ECF No. 87 at 21.  To the extent that he may have intended his arguments about FEHA and Title VII retaliation to also apply to whistleblower retaliation, however, the Court will address those arguments.

Claims of whistleblower retaliation under Section 1102.5 use the FEHA standard for an "adverse employment action," so for the reasons outlined above, Bruce has shown that he was subjected to an adverse employment action.  *Patten*, 134 Cal. App. 4th at 1387.  Bruce has not, however, shown that his whistleblowing activity was a contributing factor to the decision to place him on paid administrative leave.  As the Court noted above, Bruce's sole evidence on this point is a weak temporal link that does not rise to the level of a preponderance of the evidence.  Moreover, even if Bruce had met his burden to show that his whistleblowing was a contributing factor to the adverse employment decision, Defendants have met their burden to show by clear and convincing evidence that they would have taken the same action regardless of the whistleblowing activity because they were legally compelled to respond to the wave of serious complaints against Bruce.

### C.    Hostile Work Environment

Bruce's sixth cause of action is for discrimination via hostile work environment under Title VII and FEHA.  ECF No. 11 ¶¶ 56–57.  To make a successful hostile work environment claim based on race, the plaintiff must show: "(1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently

severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive

work environment." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *see*

*Bailey*, 16 Cal. 5th at 627–28 (noting that the same standard governs hostile workplace claims

under FEHA and Title VII).  To determine whether conduct was sufficiently severe or pervasive to

violate Title VII or FEHA, courts "look at 'all the circumstances, including the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance.'" *Id*. (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (internal

quotation marks and citation omitted), *reh'g denied*, 533 U.S. 912 (2001)) (Title VII); *Miller*, 36

Cal. 4th at 462 (FEHA).

Even where an employee is subjected to explicit racial stereotypes, insults, slurs, and

discriminatory treatment, the conduct may not rise to the level of a hostile workplace unless it is

sufficiently severe and pervasive.  *Id*. at 643; *see Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th

Cir. 1990); *but see Bailey*, 16 Cal. 5th at 631 (holding that a single racial epithet "may give rise to

a triable issue of actionable harassment depending on the totality of the circumstances").  To

evaluate the "severe or pervasive" standard, courts adopt the perspective of a reasonable person in

the plaintiff's position, considering the social context within which the behavior occurred and was

experienced by the target.  *Bailey*, 16 Cal. 5th at 629; *Fuller v. Idaho Dep't of Corr.*, 865 F.3d

1154, 1161 (9th Cir. 2017); *Miller*, 36 Cal. 4th at 462.

Bruce alleges that he was subjected to a hostile work environment because he was "placed

on administrative leave, . . . denied access to his place of employment for over 30 years, and

. . . barred from speaking to any county employee."  ECF No. 79-2 at 30.  Bruce does not allege

that he was subjected to discriminatory comments or harassment of any kind.  In fact, he identifies

no problematic conduct at all outside of the County's effort to mitigate and investigate the

complaints against him.  Bruce has identified nothing "hostile" or "abusive" about being removed

from the presence of his coworkers and ultimately placed him on leave without pay.  And Bruce

identifies no court that has ever held that such routine measures, taken in response to a series of

serious complaints by other employees, constitutes a hostile work environment.  *Cf. Mendez v.*

25

*England*, No. CV 04-6630-DSF (MCX), 2006 WL 4811384, at *5–6 (C.D. Cal. Nov. 14, 2006) (rejecting hostile work environment claim based in part on the employer's orders barring the plaintiff from being physically near a coworker who had accused him of sexual harassment, and requiring him to skip an employee picnic that the coworker might attend).

Construing the evidence in the light most favorable to him, Bruce cannot show that he was subjected to a hostile work environment. The Court grants summary judgment to Defendants on this claim.

### D.    Constructive Discharge

Bruce's final claim alleges constructive discharge because he was "compelled to resign due to the Defendants' unfair conditions." ECF No. 11 ¶¶ 50–55; ECF No. 79-2 at 30. Constructive discharge occurs when, "looking at the totality of the circumstances, 'a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Wallace v. City of San Diego*, 479 F.3d 616, 625 (9th Cir. 2007). Such conditions must be "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (quotation omitted). To succeed, "a plaintiff alleging a constructive discharge must show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1412 (9th Cir. 1996). Although the intolerability of working conditions is normally a jury question, when the Court "cannot see how a reasonable trier of fact could find that [a plaintiff] was driven from the workplace," it may properly conclude that there was no constructive discharge as a matter of law. *Brooks,* 229 F.3d at 930.

As with his hostile work environment claim, Bruce argues only that "a fact-finder could conclude that being placed on administrative leave, denied access to his job for over 30 years, and barred from speaking to any county employee . . . without any explanation other than a letter suggesting a possible violation of county policy would be intolerable for Mr. Bruce." ECF No. 79-2 at 30. But as Bruce concedes, he was told that paid administrative leave was a temporary

response to allow the County to investigate his alleged violations of County policy.  ECF No. 68-3 at 2.  Under the circumstances, no reasonable jury could conclude that these routine measures to preserve the status quo and protect other employees while the employer undertakes an investigation, without more, constitute constructive discharge.  *See Killingsworth v. State Farm Mut. Auto. Ins. Co.*, No. CV 03-1950 PHX NVW, 2005 WL 2450109, at *14 (D. Ariz. Sept. 30, 2005), *aff'd,* 254 F. App'x 634 (9th Cir. 2007) ("[A]n employer's inherently reasonable investigation and action in response to repeated serious employee complaints cannot support a finding that plaintiff was 'forced to quit.'" (quoting *Schnidrig v. Columbia Machine, Inc.,* 80 F.3d 1406, 1411 (9th Cir. 1996)).

Defendants are entitled to summary judgment on this claim because as a matter of law, the evidence cannot show that Bruce was constructively discharged.

## CONCLUSION

For these reasons, the Court hereby grants summary judgment in favor of the County and Frugoli.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated:  January 30, 2026

_____
JON S. TIGAR
United States District Judge